UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 13-10343-GAO

UNITED STATES OF AMERICA,

v.

RUBEN GONZALEZ,
Defendant.

ORDER ADOPTING REPORT AND RECOMMENDATION
June 12, 2017

O'TOOLE, D.J.

The defendant, Ruben Gonzalez, is charged by superseding indictment with one count of conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 and two counts of possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1).

The defendant has moved to suppress evidence seized without a warrant by law enforcement officers on November 26, 2013, in West Roxbury, Massachusetts (dkt. no. 36). He claims that heroin and cocaine removed from his Toyota Sienna minivan were the fruits of a violation of his Fourth Amendment right against unreasonable searches and seizures and must therefore be suppressed.

Following a three-day evidentiary hearing, the magistrate judge to whom this matter was referred filed a Report and Recommendation (dkt. no. 318) ("R&R") recommending that the motion to suppress be denied. Now before the Court are the defendant's objections to the R&R (dkt. no. 324). Having reviewed *de novo* the objected-to portions of the R&R, and having reviewed for clear error the portions of the R&R to which there is no specific reasoned objection, see 28

U.S.C. § 636(b)(1)(B); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604 (1st Cir. 1980), I approve and ADOPT the R&R to the extent described herein. The defendant's motion to suppress is DENIED.[1]

The defendant has raised five specific objections to the R&R:

First, he objects to the magistrate judge's finding that there was reasonable suspicion in light of the totality of the circumstances that the defendant had engaged in criminal activity at the time law enforcement initiated the investigatory Terry stop of the defendant's van. See Terry v. Ohio, 392 U.S. 1 (1968). The magistrate judge's conclusion that "there was more than reasonable suspicion to stop the Toyota Sienna" (R&R at 22) is amply supported by the record.

Second, the defendant objects to the magistrate judge's conclusion that the defendant was first seized when he was handcuffed. When he was "seized" is a false issue in this case. A Terry stop is properly characterized in Fourth Amendment terms as a "seizure" because every person thus stopped is temporarily detained pursuant to the officer's authorized investigatory power. See generally W. LaFave, Search and Seizure, § 9.1(c) (5th ed. 2012). That occurred when the law enforcement vehicles prevented the Sienna's forward progress on Shaw Street. Because the preconditions for a Terry stop clearly existed, that "seizure" (as a "stop") was perfectly legitimate. See, e.g., United States v. Lee, 317 F.3d 26, 31–32 (1st Cir. 2003) ("[A]ctions such as unholstering a weapon and obstructing a vehicle's path do not, as a matter of law, transmogrify an otherwise lawful Terry stop into a de facto arrest."). The defendant was later arrested, and thus

---

[1] The magistrate judge, after considering all of the evidence, set forth in the R&R a complete version of the facts pertinent to the motion to suppress. Having reviewed the record, including the parties' relevant submissions, the transcript of testimony from the three-day evidentiary hearing, and the exhibits submitted by the parties at that hearing, I now find those factual determinations to be supported by the evidence and therefore adopt them. That factual background need not be repeated here.

"seized" in that sense, after his aggressive attempt to flee and his physical resistance to the officers, actions which clearly established probable cause to justify the arrest. What constitutes, and accordingly what justifies, a "seizure" is different in the case of a <u>Terry</u> stop from the case of an arrest. <u>See</u> <u>Morelli v. Webster</u>, 552 F.3d 12, 19 (1st Cir. 2009) (distinguishing between temporary detentions, such as investigatory stops, and arrests). The record amply justifies both types of seizure in this case, and each occurred after the necessary conditions were satisfied.

What has just been said also explains why the defendant's third objection—that the magistrate judge erred in considering the defendant's attempted flight from and physical resistance to law enforcement officers—is without merit. "A <u>Terry</u> stop may lead to probable cause for arrest when 'the circumstances giving rise to reasonable suspicion' are combined with 'the developments that unfold[ ] during the <u>Terry</u> stop." <u>United States v. Dancy</u>, 640 F.3d 455, 461 (1st Cir. 2011) (quoting <u>Lee</u>, 317 F.3d at 32). As in <u>Dancy</u>, "[l]ittle is to be gained by parsing this rapid sequence of events frame by frame. From the start there was reasonable suspicion under <u>Terry</u> justifying an investigative search," and "[b]y the end there was more than ample probable cause" for the arrest. <u>Id.</u> at 462.

Gonzalez also objects to the magistrate judge's conclusion that there was probable cause for the search of the Toyota Sienna pursuant to the automobile exception to the warrant requirement. The question of probable cause to search need not be reached because the contraband was found in plain view in the course of the officers' protective sweep of the van, (Mar. 16, 2015 Tr. of Mot. to Suppress Hr'g – Day One at 16:18–16:25); (Oct. 14, 2016 Tr. of Mot. to Suppress Hr'g – Day Two at 13:2–13:16), which was validly conducted incident to Gonzalez's valid arrest. <u>See</u> <u>Maryland v. Buie</u>, 494 U.S. 325, 334 (1990) (finding protective sweep permitted when rational inferences from articulable facts would warrant a reasonably prudent officer's belief "that

the area to be swept harbors an individual posing a danger to those on the arrest scene."); United States v. Taylor, 162 F.3d 12, 20–21 (1st Cir. 1998) (finding no constitutional violation where officers performed protective sweep of a vehicle based on a reasonable belief that the occupants were dangerous.)

Fourth, the defendant objects to several factual findings that rest on testimony at the suppression hearing. Generally, the Court will not disturb the credibility determinations of a magistrate judge. See United States v. Hernández–Rodríguez, 443 F.3d 138, 147–48 (1st Cir. 2006) (citing United States v. Raddatz, 447 U.S. 667, 680–81 (1980)). I see no reason to tamper with these assessments of the testimony heard by the magistrate judge during the three-day suppression hearing. They are based on supportable impressions of credibility which the magistrate judge was in the best position to make.

Lastly, the defendant renews his arguments in response to the government's alternative theories of admissibility. Because both the initial stop and the eventual arrest (and related protective search) were justified for the reasons expressed above, the soundness of those alternative arguments need not be addressed further here.

I ADOPT the R&R (dkt. no. 318) to the extent described herein and DENY the defendant's Motion to Suppress Items Seized from the Toyota Sienna, MA Registration #58WC57, on November 26, 2013 (dkt. no. 36).

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 13-10343-GAO

UNITED STATES OF AMERICA

v.

RUBEN GONZALEZ

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT GONZALEZ'S MOTION TO SUPPRESS**
**(DOCKET ENTRY # 36)**

**April 7, 2017**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to suppress (Docket
Entry # 36) filed on May 31, 2014.  At the conclusion of an
evidentiary hearing on October 18, 2016, defendant Ruben
Gonzalez ("the defendant") requested an opportunity to file a
post-hearing brief to supplement the brief filed prior to the
hearing.  Accordingly, this court allowed both parties the
opportunity to file post-hearing briefs 14 days after receipt of
the final transcript.  After allowing the defendant an
additional extension of time after the filing of the final
transcript, the defendant and the government respectively filed
post-hearing briefs on December 1, 2016 and January 9 and 18,

2017.  The motion to suppress (Docket Entry # 36) is therefore
ripe for review.

The Superseding Indictment charges the defendant with:  (1)
a conspiracy "to possess with intent to distribute controlled
substances" in violation of 21 U.S.C. § 846; (2) possession
"with an intent to distribute a mixture or substance containing
a detectable amount of heroin" in violation of 21 U.S.C. §§
841(a)(1), (b)(1)(B)(i), and (b)(1)(B)(ii); and (3) possession
with an "intent to distribute a mixture or substance containing
a detectable amount of cocaine" in violation of 21 U.S.C. §§
841(a)(1) and (b)(1)(B)(ii).  The Superseding Indictment also
includes a drug forfeiture allegation pursuant to 21 U.S.C. §
853.

The defendant moves to suppress all the evidence seized as
a result of a stop and search of a Toyota Sienna that took place
on November 26, 2013 on Shaw Street in West Roxbury,
Massachusetts.  (Docket Entry # 36).  Having heard three days of
testimony, this court finds the following facts.

FACTUAL BACKGROUND

I.  <u>Investigation</u>

In June 2013, the Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF") and the Drug Enforcement Administration
("DEA") began investigating alleged drug trafficking and money
laundering activities of certain individuals in Boston and

2

Framingham, Massachusetts. (Ex. 2, p. 3).[1] The investigation utilized a range of resources including physical surveillance, electronic surveillance, and "Global Positioning Satellite" ("GPS") tracking devices. (Ex. 1, p. 5). As part of the investigation, this court authorized monitoring of multiple cellular devices belonging to the suspects of the investigation. (Ex. 1, pp. 5, 25). On October 23, 2013, investigating agents received court authorization to intercept communications of a cellular device belonging to defendant Roberto Mejia ("Mejia"). (Ex. 1, p. 6).

Based on intercepted conversations, ATF investigators came to believe that Mejia was in the process of finding a courier to transport narcotics to Massachusetts. (Ex. 1, p. 10). Also based on intercepted calls, ATF investigators believed that Mejia's brother ("the supplier"), who lived in Sinaloa, Mexico, supplied these drugs. (Docket Entry # 141, p. 24). On October 26, 2013, law enforcement officers followed Mejia and a female companion, Jessica Tobin ("Tobin"), as they visited two car dealerships. (Ex. 1, p. 12). A 2007 Chrysler Sebring was purchased with two cash payments and registered to Tobin. (Ex. 1, p. 13). Upon questioning personnel at the dealership after Mejia and Tobin left, the officers were told that the man with

---

[1] Citations to the record do not necessarily identify the only places in the record that support the particular fact.

Tobin initially refused to give his name but later identified himself as "John." (Ex. 1, p. 13). Records of the transaction indicate that the vehicle was purchased with two cash payments, $10,000.00 at 2:08 p.m. and $572.75 at 5:46 p.m., totaling $10,572.75. (Ex. 1, p. 13). Mejia returned without Tobin to make the second payment and take possession of the car. (Ex. 1, p. 13).

On October 27, 2013, Mejia telephoned a man that ATF Special Agent John Hayes ("Hayes") believed to be the supplier. (Ex. 1, p. 14). Hayes also believed that Mejia was discussing a future installation of a hidden compartment in the Chrysler Sebring to transport narcotics. (Ex. 1, p. 14). On October 28, 2013, GPS tracking data from the Chrysler Sebring and Mejia's cellular telephone showed that he was in the Chrysler Sebring heading to Lawrence, Massachusetts, where the vehicle was dropped off at an auto body shop. (Ex. 1, p. 15). Based on information intercepted during telephone conversations, Hayes believed that the secret compartment was installed in the vehicle while at the auto body shop. (Ex. 1, p. 16). On November 3, 2013, GPS tracking data showed that the Chrysler Sebring left Lawrence and traveled to 32 Shaw Street in West Roxbury, Massachusetts, where it was parked in a garage. (Ex. 1, p. 16).

On November 8, 2013, DEA investigators obtained utility information for 32 Shaw Street, apartment number one, in West Roxbury via an administrative subpoena. (Ex. 1, p. 17). Based on intercepted telephone calls, Hayes believed that Mejia and the individual who applied for utility service at 32 Shaw Street, apartment number one, shared a social relationship. (Ex. 1, p. 17). Additional database records indicate that the utilities at Mejia's residence are registered to that same individual. (Ex. 1, p. 17). Furthermore, physical surveillance and GPS location data showed that Mejia's Nissan Versa was parked at 32 Shaw Street on many occasions. (Ex. 1, p. 17). ATF agents believed this apartment was a storage location for narcotics and drug proceeds. (Ex. 1, p. 16).

The defendant was not a target of the investigation until November 26, 2013, when investigating agents were able to identify him. (Docket Entry # 141, p. 8). According to information from a series of intercepted telephone conversations, investigating agents believed that Mejia was expecting an incoming shipment of narcotics and was planning to meet with the defendant shortly after its arrival. (Ex. 1, pp. 17-22).

II. Discussion about Shipment

On November 20, 2013, agents intercepted a call to Mejia from a telephone number that the defendant utilized. (Docket

Entry # 141, p. 23). During the telephone call, Mejia and the defendant discussed the location, the time, and other aspects of the shipment. (Docket Entry # 141, pp. 23-24). ATF agents believed, based on this intercepted telephone call, that the shipment was a drug transaction when Mejia talked about the "campaign" and "Alex Rodriguez." (Docket Entry # 141, pp. 25-26). Based on Hayes' training and experience relating to methods employed by drug traffickers, he believed that "campaign" refers to the "white party" in the Dominican Republic which means cocaine. (Docket Entry # 141, pp. 25-26). Hayes also believed that "Alex Rodriguez" refers "to the location of the stuff" in New York City. (Docket Entry # 141, p. 26). As interpreted by Hayes, in one of the intercepted telephone calls with the defendant, Mejia said that the transaction had to be a simultaneous "one on one" transfer or "cash for drugs." (Docket Entry # 141, p. 27).

On November 21, 2013 at 9:32 p.m., another call between Mejia and the defendant was intercepted. (Docket Entry # 141, pp. 28-29) (Ex. 2, p. 8). The call was about Mejia meeting with the supplier. (Docket Entry # 141, p. 31). Mejia warned the defendant that he "should not trust anyone and he should go around a few times," which means to conduct counter surveillance. (Docket Entry # 141, p. 31).

On November 23, 2013, at approximately 11:03 p.m., a
telephone call between Mejia and the defendant was intercepted.
(Docket Entry # 141, p. 32). During the call, the defendant
asked Mejia to give him the maximum quantity of drugs possible.
(Docket Entry # 141, pp. 33-34).

III. Prior to the Operation

During the night of November 25, 2013 into the early
morning of November 26, 2013, GPS location data indicated that
the Chrysler Sebring traveled to the Bronx, New York; northern
New Jersey; and eventually back to Massachusetts. (Ex. 3, p.
3). At approximately 8:00 a.m., DEA Officer Jason Sutherland
("Sutherland") and Detective David Spirito ("Spirito") of the
Newton Police Department "assigned to the Drug Enforcement
Administration as a task force officer" (Docket Entry # 253, p.
4) observed Mejia driving the Chrysler Sebring to 32 Shaw Street
and entering the building. (Ex. 3, p. 4). Hayes and his team
believed that the Chrysler Sebring had been driven to the New
York area by Mejia to retrieve a quantity of narcotics. (Docket
Entry # 298, p. 17).

On November 26, 2013, a series of intercepted telephone
conversations occurred between Mejia and the defendant about
meeting each other at the Legacy Place shopping mall in Dedham,

Massachusetts.[2] (Docket Entry # 141, pp. 11-14, 35-44) (Ex. 2).
The telephone conversations involved arriving at the mall in two
separate cars, meeting at the mall, and leaving in one vehicle.
(Docket Entry # 141, pp. 39-40) (Docket Entry # 298, pp. 4-5)
(Ex. 2). There was never any specific talk about narcotics and
the word "transaction" was never used, but previous discussions
between Mejia and the defendant concerned "money" and
"shipments," leading agents to suspect that the two were
discussing a future drug transaction. (Docket Entry # 141, pp.
12-13).

Mejia left 32 Shaw Street around 3:57 p.m. in his Nissan
Versa. (Ex. 3, p. 4). A surveillance team, which included
Special Agent Tully Mark ("Tully") and Sutherland, followed the
Nissan Versa and observed Mejia make a number of stops. (Docket
Entry # 298, pp. 21-23) (Ex. 3, p. 4). Intercepted telephone
conversations evidence that during this time period, Mejia spoke
a number of times with the defendant and provided him directions
to the Legacy Place shopping mall. (Docket Entry # 141, 36-39).
Based on one intercepted telephone call at 6:28 p.m. between
Mejia and the defendant, Mejia stated, "Today and tomorrow is
going to be raining." (Docket Entry # 141, p. 41). Hayes
interpreted the statement to mean that, if it is raining out, it

---

[2] Initially, the officers did not know the defendant's
identity.

is a good time to do drug business because it would be more difficult for law enforcement to conduct surveillance and to observe the activities. (Docket Entry # 141, p. 41). Hayes also believed that Mejia engaged in counter-surveillance tactics, as shown by his statement that, "I have to make a 'fuin fuan' just in case," meaning he wants to make sure he was not being followed. (Docket Entry # 141, pp. 41-42). The defendant arrived at the Legacy Place shopping mall at approximately 6:44 p.m. (Ex. 2, p. 43). At around 7:16 p.m., one or more officers observed Mejia arrive at the mall in the Nissan Versa. (Docket Entry # 298, pp. 22-23) (Ex. 3, p. 4).

Upon arrival, Mejia met the defendant and entered the shopping mall area. (Ex. 3, p. 4). Task Force Officer Matthew Woodman ("Woodman"), who was in the mall, observed that Mejia and the defendant were looking around. (Docket Entry # 298, p. 46). Woodman believed that Mejia and the defendant were attempting to be cautious of surveillance. (Docket Entry # 298, p. 46). Sutherland and Special Agent Mike O'Shaughnessy ("O'Shaughnessy") were also at the mall conducting surveillance. (Docket Entry # 298, p. 5). Various officers observed Mejia and the defendant entering and departing several restaurants, bathrooms, and an Apple store. (Docket Entry # 298, pp. 23-24) (Ex. 3, p. 4). Based on Hayes' training and experience, Mejia and the defendant were conducting counter-surveillance

techniques.  (Docket Entry # 298, p. 6) (Ex. 3, p. 4).

Officers also observed Mejia and the defendant walk toward a

movie theater and then back toward the Toyota Sienna.  (Docket

Entry # 298, p. 24).  Moments later, one or more officers saw

Mejia and the defendant get into the defendant's blue Toyota

Sienna minivan and leave the mall.  (Docket Entry # 298, pp. 6,

24).  Radio transmissions reported that the defendant entered

the driver's side and Mejia entered the passenger side of the

vehicle.  (Ex. I, p. 25).  A number of officers in their

vehicles followed the Toyota Sienna when it left the mall but

lost the vehicle a short time later as it exited Route I-93 by

the South Shore Plaza in Braintree.  (Docket Entry # 296, p. 10)

(Docket Entry # 298, p. 6).

Based in part on the above information, this court

authorized execution of search warrants for the residence of 32

Shaw Street (apartment number one) and the 2007 Chrysler Sebring

on November 26, 2013.  (Docket Entry # 141, p. 9) (Docket Entry

# 298, pp. 8-9) (Ex. 3).

IV.  The Operation

At some point after 8:00 p.m. and having lost track of the

Toyota Sienna, Special Agent James Connolly ("Connolly") and

various Task Force officers went back to the area of Shaw

Street.  (Docket Entry # 296, p. 13).  Due to the concern for

officers' safety, Connolly and his team decided that the best

way to effectuate the arrest was to conduct a traffic stop of the Toyota Sienna before it left Shaw Street and traveled into a residential area. (Docket Entry # 298, p. 10). According to the plan, when the Toyota Sienna left 32 Shaw Street, officers "were going to have a vehicle come down the street heading [in] the same direction" as the Toyota Sienna, "and then another vehicle heading down the street in the opposite direction" of the Toyota Sienna and eventually "execute a vehicle containment." (Docket Entry # 298, p. 70). Connolly put out the plan over the radio and notified other officers. (Docket Entry # 298, p. 70).

At approximately 9:00 p.m., O'Shaughnessy joined Spirito and Task Force Officer Tiberi ("Tiberi") who were maintaining surveillance in the vicinity of 32 Shaw Street. (Docket Entry # 296, p. 9). Meanwhile, there were about nine or ten police vehicles in the vicinity. (Docket Entry # 296, p. 15).

At approximately 10:57 p.m., officers observed the blue Toyota Sienna arrive at 32 Shaw Street. (Docket Entry # 141, p. 45) (Ex. 3, p. 4). Connolly radioed to notify other officers about the arrival of the Toyota Sienna and to execute the plan if necessary. (Docket Entry # 296, p. 17). Shortly thereafter, officers observed the defendant and Mejia exit the Toyota Sienna and enter the front door at 32 Shaw Street. (Docket Entry # 141, p. 45) (Ex. 3, p. 4). Meanwhile, Connolly positioned his

vehicle as the first vehicle coming off Lagrange Street onto
Shaw Street. (Docket Entry # 298, p. 72). In this way,
Connolly's vehicle would be the first one to make contact with
the front side of the Toyota Sienna, as he drove south and the
Toyota Sienna drove north. (Docket Entry # 298, p. 72).

Shortly before 11:30 p.m., Tiberi observed Mejia and the
defendant exit 32 Shaw Street and the defendant "enter the
driver's side door" of the Toyota Sienna and Mejia get into "the
front passenger door" of the vehicle. (Docket Entry # 298, pp.
29-30) (Ex. I, p. 27) (Ex. 3, pp. 4-5). It was a dark night
such that there was no indication that officers saw either Mejia
or the defendant carry a package. (Docket Entry # 298, pp. 30-
31). In the meantime, Connolly's vehicle was parked slightly
around the corner on Shaw Street. (Docket Entry # 298, p. 73).
An additional law enforcement vehicle was positioned on Crockers
Lane, a side street off Shaw Street. (Docket Entry # 296, p.
17). Woodman positioned his vehicle south of Shaw Street near
Sparrow Street. (Docket Entry # 298, p. 48). Officers Kevin
Lima, Kevin O'Neill, and Joseph Connors ("Connors") were
instructed to position their vehicles in the middle of Shaw
Street. (Docket Entry # 296, p. 18).

Once the Toyota Sienna began to move toward Lagrange
Street, Connolly drove slowly toward 32 Shaw Street. (Docket
Entry # 298, p. 73). Two vehicles were "piggy back in line"

traveling directly behind Connolly's vehicle.[3]  (Docket Entry #
298, p. 73).  Connolly activated the emergency lights to conduct
a vehicle stop as the Toyota Sienna approached Connolly's
vehicle on Shaw Street.  (Docket Entry # 298, pp. 73-74) (Docket
Entry # 296, p. 4) (Ex. 3, p. 5).  The front bumper of
Connolly's vehicle met the front bumper of the Toyota Sienna.
(Docket Entry # 296, p. 4).  The Toyota Sienna stopped.  (Docket
Entry # 296, p. 4).

     Connolly, Sergeant Joe Sullivan ("Sullivan") and Tully
exited their vehicles and approached the Toyota Sienna by foot
with weapons drawn.  (Docket Entry # 296, p. 4).  Connolly had a
DEA badge over his clothing, Sullivan wore a Boston Police
windbreaker, and Tully wore a vest with DEA markings.  (Docket
Entry # 296, p. 21) (Ex. I, pp. 30-31).  Connolly was
approaching the middle of the front side of the Toyota Sienna.
(Docket Entry # 296, pp. 22-23).  Sullivan and Tully were
approaching the driver's side.  (Docket Entry # 296, p. 24).
All three officers were shouting, "Police.  Get out of the
vehicle."  (Docket Entry # 296, p. 23).

     The Toyota Sienna suddenly went into reverse at a high rate
of speed and proceeded back down Shaw Street striking Woodman's
vehicle and a civilian vehicle.  (Docket Entry # 298, p. 75)

---

[3]  This court considered *all* of the evidence in arriving at the
above finding.

(Docket Entry # 296, p. 5) (Ex. I, p. 31).  After traveling

approximately 30 yards, the Toyota Sienna came to rest in front

of 32 Shaw Street having crashed into the civilian vehicle.

(Docket Entry # 296, pp. 5, 26, 28) (Ex. 3, p. 5).  As logically

explained by Connolly, the defendant was not contained "because

he was able to travel" the "30 yards or so" in the Toyota

Sienna.  (Docket Entry # 296, p. 30).  Connolly, Sullivan, and

Tully "continued to pursue" the Toyota Sienna on foot in the

street and "to announce police presence."  (Docket Entry # 296,

pp. 5, 25).  As they approached, Connolly saw the defendant move

his right hand off the steering wheel and then out of sight.  At

the same time, Connolly "heard the vehicle accelerating."

(Docket Entry # 296, p. 5).  Connolly was standing about 15

yards directly in the path of the vehicle and, in fear for his

life, fired four rounds at the vehicle from his weapon.  (Docket

Entry # 296, pp. 5-6, 28).  The defendant then stopped

accelerating the vehicle.  (Docket Entry # 296, p. 6).

Officers took Mejia into custody without incident.  He

simply "walked out of the car and sat down next to the vehicle."

(Docket Entry # 296, p. 6) (Docket Entry # 298, p. 12).  The

defendant did not cooperate and struggled with the four officers

trying to remove him from the vehicle.  (Docket Entry # 296, p.

6) (Docket Entry # 298, p. 12).  Once the defendant was removed

from the Toyota Sienna, he continued to struggle with the

officers.  (Docket Entry # 296, pp. 6-7) (Ex. 3, p. 5).  While

on the ground, the defendant repeatedly tried to stand up and

refused to place his hands behind his back, forcibly clenching

his arms beneath his position to avoid being handcuffed.

(Docket Entry # 296, pp. 6-7).  The defendant was finally

handcuffed and experienced bruises to his face during the

struggle.  (Docket Entry # 296, p. 7) (Docket Entry # 298, p.

12) (Ex. C).

After securing Mejia and the defendant, Tully went to the

driver's side of the Toyota Sienna "and placed the gear shift

into park."  (Docket Entry # 296, p. 8).  Prior thereto but

after removing Mejia and the defendant from the Toyota Sienna,

officers opened the vehicle's rear sliding doors to clear the

vehicle of any additional occupants inside in light of having

lost track of the vehicle after it left the Legacy Place

shopping mall.  (Docket Entry # 298, pp. 12-13) (Docket Entry #

296, pp. 7-8) (Ex. 3, p. 5).  When the officers opened the

sliding doors, they observed in plain view, on the floor of the

vehicle behind the front passenger seat, a black plastic bag of

a "brick-like substance."  (Docket Entry # 296, p. 8) (Docket

Entry # 298, pp. 13, 39) (Docket Entry # 141, pp. 16-17) (Ex. 7,

8).  The bag was shaped in the form of a brick.  (Docket Entry #

298, pp. 13, 39) (Ex. 7, 8).  According to Hayes' testimony,

based on officers' training and experience, cocaine is most

often shaped and compressed into brick-sized forms. (Docket
Entry # 298, p. 14). Shortly thereafter, the Boston Police
conducted a crime scene investigation which resulted in a delay
of at least an hour before photographs were taken of the bag,
including the inside of the bag. (Docket Entry # 298, pp. 39-
40) (Ex. 7-9). The plastic bag contained two separate items.
One item was the size of a brick or book and "turn[ed] out to be
a kilogram of cocaine." (Docket Entry # 298, p. 15) (Ex. 9).
The other object consisted of powder in "a ziplock [sic] bag
wrapped in 'Batman' tape" which tested positive for heroin.
(Docket Entry # 298, p. 15) (Ex. 3, p. 6).

Meanwhile, this court issued search warrants for 32 Shaw
Street and the 2007 Chrysler Sebring. (Docket Entry # 141, p.
9) (Docket Entry # 298, p. 26) (Ex. 3, p. 3). At approximately
11:35 p.m., the search warrant for 32 Shaw Street, apartment
number one, was executed. (Ex. 3, p. 5). Investigators
recovered a black bag in the front bedroom closet. (Ex. 3, p.
5). The bag "contained 13 brick-shaped objects which appeared
to be kilograms of cocaine and/or heroin" and a separate "bag
containing what appeared to be heroin." (Ex. 3, p. 5).
"Investigators also located a digital scale, two rolls of shrink
wrap," a can of grease in a kitchen cabinet and "a roll of
'Batman' tape." (Ex. 3, p. 5). Hayes and Agent Jason Ryan
field tested the powder from one of the brick-shaped objects

located in the front bedroom closet and the powder tested positive for the presence of cocaine. (Ex. 3, p. 5).

DISCUSSION

The motion to suppress raises three primary issues: (1) the constitutionality of the investigatory stop; (2) the constitutionality of the defendant's arrest; and (3) whether the agents had probable cause to search the Toyota Sienna or another justification for the search or sweep.

I.   Investigatory Stop

The defendant asserts there was no reasonable suspicion to support Connolly and Sullivan's stop and no reason to believe the defendant was involved in criminal activity. The government disagrees.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. This right proscribes law enforcement officers from making intrusive encounters that fall short of a full scale arrest. United States v. Gilliard, 847 F.2d 21, 24 (1st Cir. 1988). The Supreme Court in Terry v. Ohio, 392 U.S. 1, 30 (1968), established the baseline rule allowing an officer to conduct a "brief investigatory stop if he has a reasonable, articulable suspicion that criminal activity is afoot." United States v. Romain, 393 F.3d 63, 71 (1st Cir.

2004); accord United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013) ("police may stop and briefly detain an individual for investigative purposes if the police have a reasonable suspicion that criminal activity is afoot").  When a person is "seized" for a Terry stop and officers subject him to a "search," the police conduct "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures."  Terry v. Ohio, 392 U.S. at 19-20.

Assessing the constitutionality of a Terry stop implicates a dual inquiry of "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference."  Terry v. Ohio, 392 U.S. at 20; accord United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004) ("first determi[ning] whether the officers' actions were justified at their inception, and if so whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop") (internal brackets, citations and quotation marks omitted); United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (court considers "whether the officers' actions were justified at their inception, and if so, whether the officers' subsequent actions were fairly responsive to the emerging tableau").  The actions of the police must be

"reasonable under the circumstances," United States v. McCarthy,
77 F.3d 522, 529 (1st Cir. 1996), and in making this
determination the court employs "a wide lens and survey[s] the
totality of the circumstances." Romain, 393 F.3d at 71.

The reasonable suspicion test amounts to an intermediate
standard requiring "more than a naked hunch that a particular
person may be engaged in some illicit activity" but less than
probable cause "or evidence of a direct connection linking the
suspect to the suspected crime." United States v. Chhien, 266
F.3d at 6; accord United States v. Cook, 277 F.3d 82, 85 (1st
Cir. 2002) (standard requires "more than unfounded speculation
but less than probable cause"). Employing a contextual analysis
and affording a degree of deference to the expertise of law
enforcement officers, Cook, 277 F.3d at 85, "a stop is justified
at its inception if the officer can 'point to specific and
articulable facts which, taken together with rational inferences
from those facts, reasonably warrant [the] intrusion.'" Romain,
393 F.3d at 71 (quoting Terry v. Ohio, 392 U.S. at 21).

The propriety of the initial stop depends, in turn, upon
"what the officer knows (or has reason to believe) and how
events unfold." Romain, 393 F.3d at 71. The touchstone is the
reasonableness of the conduct in light of all the attendant
circumstances. United States v. Osbourne, 326 F.3d 274, 277
(1st Cir. 2003). Reasonableness entails a balancing of "'the

need to search (or to seize) against the invasion which the search (or seizure) entails.'" Terry v. Ohio, 392 U.S. at 21; accord United States v. Chhien, 266 F.3d at 6 ("court must balance 'the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion'"); United States v. Young, 105 F.3d 1, 7 (1st Cir. 1999) ("[w]eighing 'the limited violation of the individual's privacy against the opposing interests in crime prevention and detection and in the police officer's safety'").

Here, the officers had the requisite reasonable articulable suspicion to stop the defendant to conduct an investigation and determine if he had been involved in criminal activity. In June 2013, ATF and DEA agents began investigating alleged drug trafficking and money laundering activities of certain individuals in Boston and Framingham. In the early stage of investigation, ATF investigators came to believe that Mejia was seeking a courier to transport narcotics to Massachusetts from Mexico. In late October, a 2007 Chrysler Sebring was purchased with two cash payments and Mejia took possession of the car. In addition, Mejia contacted the supplier and discussed the future installation of a hidden compartment in the Chrysler Sebring to transport narcotics. Thereafter, an auto body shop installed a hidden compartment in the vehicle. On November 20, 2013, agents intercepted a call to Mejia from a telephone number utilized by

the defendant, discussing the location, the time, and other aspects of the shipment, which the agents believed was a drug shipment. Based on the evidence of planning, the purchase of the car, the installation of the hidden compartment, and the series of intercepted communications and the telephone number that belonged to the defendant, agents reasonably believed that Mejia was preparing for an incoming shipment of narcotics and that the defendant was involved. See United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000) ("combination of independently innocent behaviors and circumstances, both general and specific, can create reasonable suspicion in certain cases"); Terry v. Ohio, 392 U.S. at 30 (reasonable suspicion may exist when totality of discerned circumstances signals "unusual conduct which leads [the officer] reasonably to conclude in light of his experience that criminal activity may be afoot").

In the afternoon of November 26, a series of intercepted telephone conversations occurred between Mejia and the defendant about meeting up at the Legacy Place shopping mall in Dedham. Later, Mejia met up with the defendant and entered the shopping mall area. Woodman observed that they were looking around and attempting to be cautious about surveillance. Officers also observed Mejia and the defendant engage in counter-surveillance techniques such as entering and leaving several restaurants and a bathroom. The officers lost track of the Toyota Sienna

21

shortly after it left the mall and at 10:57 p.m. and observed the vehicle arrive at 32 Shaw Street.

These facts support a finding that the agents and officers had a reasonable suspicion that a drug transaction was afoot where, as here, the targeted individuals are "in the right place at the right time." United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003). Shortly thereafter, officers observed Mejia and the defendant exit the Toyota Sienna and enter 32 Shaw Street, "believed to be a storage location for narcotics and drug proceeds." (Ex. 1, p. 16). Shortly before 11:30 p.m., Tiberi saw Mejia and the defendant exit 32 Shaw Street and enter the Toyota Sienna. With possession of these specific and articulable facts, the officers reasonably suspected that criminal activity had just taken place. United States v. Arnott, 758 F.3d 40, 44 (1st Cir. 2014) ("intercepted telephone calls, the repeated surveillances, the evident pattern and" officer's observations "yielded ample reason to suspect that the Saturn's occupants had just participated in a drug deal"). Overall, there was more than reasonable suspicion to stop the Toyota Sienna and the officers' actions were reasonably related to the circumstances justifying the stop.

II. <u>Seizure of the Defendant</u>

    A. <u>The Defendant was Seized when Handcuffed</u>

The defendant argues that he was seized when officers blocked, made contact with and converged upon the Toyota Sienna with weapons drawn and commands shouted at him.  The government disagrees and argues that the defendant was not seized until he was handcuffed.

A seizure occurs when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.  See Terry v. Ohio, 392 U.S. at 19; California v. Hodari D., 499 U.S. 621, 626 (1991) (seizure requires "*either* physical force . . . *or*, where that is absent, submission to the assertion of authority").  The mere grasping or application of physical force is sufficient.  See Hodari D., 499 U.S. at 624.  The show of authority must be such that a reasonable person would believe that he was not free to leave.  See United States v. Mendenhall, 446 U.S. 544, 569 (1980).  In addition, a seizure requires that the citizen must actually submit to the show of authority.  See United States v. Holloway, 499 F.3d 114, 117 (1st Cir. 2007); United States v. Smith, 423 F.3d 25, 31 (1st Cir. 2005) ("[t]o constitute a seizure, there must not only be a show of authority sufficient to make a reasonable person believe that he was not free to leave, but also submission to that authority").  A police officer may make a seizure by a "show of authority" and "without the use of physical force," but there is no seizure without actual

submission; otherwise, there is at most an attempted seizure, as far as the Fourth Amendment is concerned.  Brendlin v. California, 551 U.S. 249, 254 (2007).

In light of the facts, the defendant was not seized until he was handcuffed.  Initially, Connolly activated emergency lights in a show of authority to conduct a vehicle stop as the Toyota Sienna approached the law enforcement vehicle on Shaw Street.  When the Toyota Sienna stopped, three officers started approaching the Toyota Sienna by foot with weapons drawn and shouting, "Police.  Get out of the vehicle."  Although the Toyota Sienna stopped, the defendant did not actually submit to the authority and his liberty was not restrained because the Toyota Sienna suddenly went in reverse at a high rate of speed and struck Woodman's unmarked vehicle and a civilian vehicle. See United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994) ("where a suspect fails to submit to an officer's approach and runs away, he is not seized until he is apprehended").  As stated in Mendenhall, "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Mendenhall, 466 U.S. at 554.  Here, a reasonable person would have believed that he was not free to leave when agents shouting "Police.  Get out of the vehicle," with weapons drawn.  In this case, however,

it is not enough to show that the defendant was seized.  <u>See</u>
<u>Hondari D.</u>, 499 U.S. at 628 (discussing <u>Mendenhall</u> test).  This
is at most an attempted seizure, which is beyond the scope of
the Fourth Amendment.  <u>See</u> <u>County of Sacramento v. Lewis</u>, 523
U.S. 833, 845 n.7 (1998).  More specifically, to constitute a
seizure, the defendant needed to show his actual submission to
the authority.  <u>See</u> <u>United States v. Smith</u>, 423 F.3d at 41.
When the Toyota Sienna finally came to a stop, the defendant
refused to exit the vehicle and when he was removed from the
vehicle, he struggled with officers.  Eventually, the defendant
submitted to officers when he was handcuffed.

   B.   <u>Constitutionality of the Defendant's Seizure</u>

     The defendant argues that he was seized without adequate
justification.  The government disagrees and contends inter alia
that the defendant's flight and resistance established probable
cause.

     The Fourth Amendment's protection against "unreasonable
seizures" includes a seizure of the person.  <u>Henry v. United</u>
<u>States</u>, 361 U.S. 98, 100 (1959).  While the Supreme Court has
expressed a preference for the use of arrest warrants when
feasible, it has never invalidated an arrest supported by
probable cause solely because the officers failed to secure a
warrant.  <u>See</u> <u>Gerstein v. Pugh</u>, 420 U.S. 103, 113 (1975).
Deliberately furtive actions and flight at the approach of law

officers are strong indicia of mens rea.  See Sibron v. New

York, 392 U.S. 40, 66-67 (1968) (suspect's deliberately furtive

movements when approached by police officers provide "strong

indicia of mens rea"); United States v. Awer, 770 F.3d 83, 92

(1st Cir. 2014); United States v. Dancy, 2007 WL 2789279, at *3

n.9 (D.Mass. Sept. 25, 2007), aff'd, 640 F.3d 455 (1st Cir.

2011).  As has been held by the Supreme Court, "flight at the

approach of law enforcement officers, when coupled with specific

knowledge relating the suspect to evidence of a crime, is a

proper factor to be considered in the decision to make an

arrest."  United States v. Martinez-Molina, 64 F.3d 719, 729 n.8

(1st Cir. 1995) (citing Sibron, 392 U.S. at 66-67).  In the

context of an arrest, the "'fellow officer'" also applies such

that "the focus is upon the collective knowledge possessed by,

and the aggregate information available to, all the officers

involved in the investigation."  United States v. Winchenbach,

197 F.3d 548, 555 (1st Cir. 1999).

     In the case at bar, the seizure of the defendant was

constitutional under the Fourth Amendment because the

defendant's flight escalated the existing reasonable suspicion

to the higher standard of probable cause.  See United States v.

Dancy, 640 F.3d 455, 461-62 (1st Cir. 2011).  Here, not only did

the officers have the initial reasonable suspicion to stop the

Toyota Sienna, the defendant's sudden reverse of the Toyota

Sienna and attempt to flee gave rise to probable cause to arrest the defendant. See United States v. Halloway, 962 F.2d 451, 461 (5th Cir. 1992) (defendant's attempted escape from officers was sufficient additional factor to turn officers' reasonable suspicion to probable cause). In addition, the probable cause to arrest the defendant was supplemented when he refused to exit the Toyota Sienna and struggled with the officers. In light of the totality of the circumstances, including the collective knowledge of the investigation described previously, the defendant's arrest is supported by probable cause and constitutional under the Fourth Amendment.

III. The Search and Seizure

   A.   Probable Cause to Search

   The defendant argues that the officers did not have probable cause to search the Toyota Sienna because the defendant was merely associated with Mejia. Mere association does not constitute probable cause, according to the defendant. The government argues that the totality of the circumstances in this case supported probable cause to search the Toyota Sienna. (Docket Entry # 104, pp. 16-22) (Docket Entry # 116, pp. 10-11) (Docket Entry # 306, pp. 9-12). As argued by the government, "[f]or the same reasons" there was "probable cause to arrest" the defendant, the officers "also had probable cause to search the van." (Docket Entry # 306, p. 10) (Docket Entry # 116, pp.

27

10-11).  As correctly pointed out by the government, "'The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought.'"  (Docket Entry # 306, p. 11) (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978)).

"'The Fourth Amendment requires adherence to judicial processes.'"  Katz v. United States, 389 U.S. 347, 357 (1967) (brackets omitted).  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  Id.; Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); California v. Acevedo, 500 U.S. 565, 579 (1991).  "[U]nder the 'automobile exception,' the only essential predicate for a valid warrantless search of a motor vehicle by law enforcement officers is 'probable cause to believe that the vehicle contains contraband or other evidence of criminal activity.'"  United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992) (internal brackets omitted); accord United States v. Goncalves, 642 F.3d 245, 249 (1st Cir. 2011); see also Maryland v. Dyson, 527 U.S. 465, 466 (1999) ("'automobile exception' has no separate exigency

requirement").[4]  Moreover, the subjective intentions of the officers "play no role in ordinary, probable-cause Fourth Amendment analysis."  <u>Whren v. U.S.</u>, 517 U.S. 806, 813 (1996).

Probable cause is evaluated in light of the totality of the circumstances.  <u>United States v. Uricoechea-Casallas</u>, 946 F.2d 162, 165 (1st Cir. 1991).  In assessing the totality of the circumstances and under the "'collective knowledge' doctrine," the "'focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation.'"  <u>United States v. Brown</u>, 621 F.3d 48, 57 (1st Cir. 2010) (quoting <u>United States v. Winchenbach</u>, 197 F.3d at 555).  Moreover, to establish probable cause, the government need not present "the quantum of proof necessary to convict."  <u>Uricoechea-Casallas</u>, 946 F.2d at 165; <u>accord</u> <u>Winchenbach</u>, 197 F.3d at 555 (probable cause "does not require the same level of certitude or quantum of proof that is necessary to convict").

---

[4]  Here, the vehicle was parked on a public street.  In any event, "The rationale and scope of the automobile exception has changed" since the 1971 decision in <u>Coolidge v. New Hampshire</u>, 403 U.S. 443 (1971).  <u>United States v. Smith</u>, 533 F.Supp.2d 227, 233 (D.Mass. 2008).  After <u>Coolidge</u>, two First Circuit opinions upheld warrantless searches of automobiles parked and unoccupied in driveways.  <u>See</u> <u>U.S. v. Goncalves</u>, 642 F.3d at 250-51; <u>U.S. v. Moscatiello</u>, 771 F.2d 589, 599-600 (1st Cir. 1985), <u>vacated on other grounds by</u> <u>Murray v. U.S.</u>, 487 U.S. 533 (1988); <u>United States v. Smith</u>, 533 F.Supp.2d at 233; <u>see also</u> <u>United States v. Jones</u>, 2014 WL 1154480, at *16 (D.Conn. Mar. 21, 2014).

Here, possessing the aggregate information from the
investigation, the officers had probable cause to believe that
the Toyota Sienna contained contraband from a recent drug
transaction involving the defendant and Mejia at the time the
officers opened the sliding doors and observed the brick-shaped
plastic bag in plain view.  On November 20, 2013, investigators
intercepted a number of telephone calls from a telephone number
utilized by the defendant.  The conversations concerned the
location, the time, and other aspects of the drug shipment.  In
one of the intercepted telephone calls, Mejia specifically said
to the defendant that the transaction had to be a simultaneous
"one on one" transfer or "cash for drugs."  (Docket Entry # 141,
p. 27).  On November 21, another intercepted call between Mejia
and the defendant took place during which Mejia told the
defendant that he was meeting with the supplier and warned the
defendant to do some counter surveillance by "go[ing] around a
few times."  (Docket Entry # 141, p. 31).  On November 23, the
defendant told Mejia during an intercepted telephone call that
he wanted the most drugs possible.  At approximately 3:47 p.m.
on November 26, a series of intercepted telephone conversations
occurred between Mejia and the defendant about meeting at the
Legacy Place shopping mall.  At around 7:16 p.m. on the same
day, Mejia met with the defendant at the expected time and the
expected location.  After leaving the mall together in the

Toyota Sienna, officers observed Mejia and the defendant arrive in the vicinity of 32 Shaw Street at around 11:00 p.m.  A short time later, the defendant and Mejia exited the Toyota Sienna and entered 32 Shaw Street, "believed to be a storage location for narcotics and drug proceeds."  (Ex. 1, p. 16).  The officers also had a search warrant to search the apartment because of sufficient probable cause to believe there was evidence, such as drug ledgers and drug proceeds, of a conspiracy to distribute heroin and cocaine.  (Ex. 1).  At approximately 11:28 p.m., Mejia and the defendant exited 32 Shaw Street and entered the Toyota Sienna.  When officers activated the emergency lights, the Toyota Sienna did not yield to the police by stopping the vehicle.  Instead, the defendant attempted to flee by reversing the vehicle at a high speed.  Under the totality of the circumstances, there was probable cause to believe that the Toyota Sienna contained contraband.  See Husty v. United States, 282 U.S. 694, 701 (1931) (information that defendant had illegal liquor in automobiles, combined with prompt attempt of suspect's two companions to escape when hailed by the officers, provided reasonable grounds for belief that illegally possessed liquor would be found in the car); United States v. Goncalves, 642 F.3d at 249 (driver's flight from police, locking car, and tossing away key supported inference that drugs or guns were concealed within).  Where, as here, "'probable cause justifies the search

31

of a lawfully stopped vehicle, it justifies the search of *every part of the vehicle and its contents* that may conceal the object of the search.'" United States v. Goncalves, 642 F.3d at 249-50 (quoting Wyoming v. Houghton, 526 U.S. 295, 301 (1999), quoting United States v. Ross, 456 U.S. 798, 825 (1982)); Arizona v. Gant, 556 U.S. 332, 347 (2009) ("[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," Ross, 456 U.S. at 820-21, "authorizes a search of any area of the vehicle in which the evidence might be found").

In sum, for the foregoing reasons, the officers had probable cause to believe the Toyota Sienna contained contraband which provides the necessary basis for a warrantless search of the vehicle under the automobile exception. As a result, it is not necessary to address the government's remaining arguments regarding other means to justify the arrest and the search, including the protective sweep doctrine, see United States v. Gray, 2013 6178505, at *8 n.15 (N.D.Ga. Oct. 31, 2013), "or [the] defendant's other bases for exclusion." U.S. v. Luna-Ilarraza, 2007 WL 4212342, at *8 (D.P.R. Nov. 27, 2007).

CONCLUSION

In accordance with forgoing discussion, this court **RECOMMENDS**[5] that the defendant's motion to suppress (Docket Entry

---

[5] Any objection to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report

# 36) be **DENIED.**

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

and Recommendation to which objection is made.  <u>See</u> Fed.
R.Crim.P. 59(b).  Any party may respond to another party's
objections within 14 days after service of the objections.
Failure to file objections within the specified time "waives a
party's right to review."  <u>Id.</u>